In the Matter of the Estate of THOMAS E. FORD, Deceased. ANNE W. FORD, as Executrix of THOMAS E. FORD, Deceased, Appellant; MARIAN MOORE, as Guardian of NANEEN EVANS FORD, an Infant, et al., Respondents.

First Department, March 19, 1981

### APPEARANCES OF COUNSEL

*Gerard T. Shevlin* of counsel *(Lunney & Crocco,* attorneys), for appellant.

*Sheldon D. Camhy* of counsel *(Adam B. Gilbert* with him on the brief; *Shea & Gould,* attorneys), for respondents.

### OPINION OF THE COURT

MURPHY, P. J.

Thomas E. Ford died on June 3, 1979. He left an estate with an estimated value between $2,000,000 and $3,000,000.

In a will dated December 22, 1978, the decedent left his entire residuary estate to Anne W. French, then his fiancée, and he named her as the executrix. On April 20, 1979, French became the decedent's second wife. Marian Moore, the decedent's first wife, and Naneen Evans Ford, the sole child of the first marriage, were not mentioned in that will.

Anne W. Ford (the proponent) petitioned to have the will, dated December 22, 1978, admitted to probate. On August 29, 1979, the return date of the citation, the firm of Shea and Gould appeared for Moore, the guardian of infant Naneen's property. The Shea firm objected to the probate of the will on behalf of Naneen (the objectant) because (a) the decedent was suffering from advanced chronic alcoholism on December 22, 1978 and (b) the will was induced by the undue influence of the proponent. Moore herself did not object to the probate of the will since she had renounced all rights to the estate in a prior separation agreement.

On that same date, the Surrogate, on his own initiative, appointed Ninette S. Bordoff as the guardian ad litem for Naneen (SCPA 403, subd 2). At the time of her appointment, Bordoff was acting as a "voluntary law assistant" in the Surrogate's Court. Bordoff duly filed her appearance and consent to act.

On November 2, 1979, Bordoff filed an 18-page report in which she recommended to the Surrogate that the will not be probated at that time. Bordoff asked that the Surrogate grant her $2,500 to $5,000 so that a professional investigator could complete the investigation. Upon its face, the report appears to be thorough and fair. While the report notes that the decedent seemingly drank himself to death, it stresses that the proponent encouraged his rehabilitation after they had met at Alcoholics Anonymous. The report also emphasizes that Edward A. Reilly, the draftsman of the subject will did indicate that the decedent may have become disenchanted with the objectant before this third will was drafted. Bordoff further stressed that the objectant was the income beneficiary and contingent remainderman of two trusts approximating $300,000 to $400,000 each.

In this background, Bordoff sought funds to interview the decedent's psychiatrists, to peruse his medical records and otherwise to develop a profile as to his personality and motivation. In one of her concluding paragraphs, Bordoff succinctly stated her position to the Surrogate: "While the known facts and circumstances prevent me at this time from recommending that the propounded will be admitted to probate, they do not, however, permit me to substantially join Messrs. Shea Gould Climenko & Casey in filing objections to probate in order to protect the best interests of my ward".

On or about November 29, 1978, Sheldon D. Camhy of the Shea firm, on behalf of the objectant, mailed petitions to the guardian ad litem and to the proponent's law firm. In those petitions, the objectant sought the removal of Bordoff and the appointment of Sheldon D. Camhy as her replacement. Parenthetically, it should be observed that Camhy had previously been acting on behalf of the guardian, Marian Moore. In a supporting affidavit, Camhy advanced the reason why Bordoff should be replaced: "After we had been retained, it was called to my attention that Ms. Bordoff was a volunteer law assistant to this Court. It also became apparent, after the service of a motion to strike virtually all the interrogatories propounded jointly by my firm and Ms. Bordoff, that this matter might involve lengthy and time-consuming litigation burdensome to Ms. Bordoff given her other duties, and that it might be more appropriate if Naneen's guardian *ad litem* were not associated with this Court. Under all circumstances, Naneen Evans Ford and my client, Mrs. Moore, thought it appropriate that I be nominated as guardian *ad litem* in the place of Ms. Bordoff, and requested me to assume such responsibilities."

On November 30, 1979, the Surrogate signed the order substituting Camhy as the successor guardian ad litem. Neither Bordoff nor the proponent's law firm had ever received the petition on the date the order was signed. In a motion returnable January 29, 1980, Camhy sought an order permitting the expenditure of $5,000 from estate funds to complete the investigation. The proponent cross-moved to vacate the order, entered November 30, 1979,

appointing the successor guardian ad litem. The Surrogate denied the motion-in-chief on the ground that no precedent permitted him to allocate estate funds for such an investigation. This portion of the order is not contested upon appeal. The cross motion was denied on the ground that the proponent had no standing to object since her interests were totally adverse to those of the infant. This appeal is concerned solely with the denial of the cross motion.

The Surrogate's Court Procedure Act does not provide for the procedure to be followed or the criterion to be applied in removing a guardian ad litem. Nonetheless, implied in a Surrogate's power of appointment is his inherent power to remove a guardian ad litem for just cause or where the interests of the infant will otherwise be promoted. (Cf. *Matter of Haynes*, 82 Misc 228.) Although a Surrogate has the power to appoint a guardian ad litem, on his own initiative, in the first instance (SCPA 403, subd 2), he does not have unfettered discretion to remove a guardian ad litem once appointed. Removal should be sought by motion served upon all parties as well as the guardian ad litem; the motion should allow for an appropriate return date and should be supported by competent proof (CPLR 2103, subd [e]; 2214; cf. *Matter of Haynes, supra*).

Neither Bordoff nor the proponent had an opportunity to respond to the objectant's petitions seeking the removal of the original guardian ad litem since the order of removal was signed before the petitions were received in the mail. This improper procedure was not remedied by the subject cross motion to vacate that order of removal. The original guardian ad litem was never served with that cross motion. Thus, the papers submitted to the Surrogate on both the petition to remove and the cross motion to vacate the order of removal do not contain any response from Bordoff. On each occasion, the Surrogate should have directed that Bordoff file a sworn statement giving her position in this matter.

Part of the difficulties in this case seem to arise from the fact that Bordoff acted in the capacity of a "voluntary law assistant". The powers and functions of the voluntary law assistant are not developed in this record. Unquestion-

ably, these volunteers must be commended for their dedicated services on behalf of the Surrogate's Court. Nonetheless, it must be recognized that these volunteers continue to serve in the Surrogate's Court at the will of the Surrogate. They are also appointed, from time to time, in a nonvoluntary capacity. Therefore, in any particular proceeding, there may be a hesitancy upon the part of a volunteer to pursue a course of action or to take a position that is contrary to the known wishes of a Surrogate. In this setting, a volunteer may, subconsciously, fail to function in the totally independent fashion that is required of a guardian ad litem.

In this proceeding, Bordoff evidenced an intent in her report to go forward with her investigation. There was no hint in that extensive report that she did not have the time or the resources to become involved in this complex litigation. Several weeks later, upon being served with objectant's petition for her removal and the subsequent order of removal, Bordoff inexplicably remained silent. Consequently, we have no way of determining whether she acquiesced in the removal. While an unforeseen change of circumstances may well justify a substitution for the original guardian ad litem, an explanation should be forthcoming from Bordoff as to the nature of that unforeseen change.

With regard to the proponent's standing in this matter, it may be safely said that a proponent may not normally challenge the initial appointment of a guardian ad litem by a Surrogate. However, a different situation is presented once a guardian ad litem is appointed. SCPA 404 (subd 3) provides as follows with regard to the duties of a guardian ad litem: "3. He shall file an appearance and take such steps with diligence as deemed necessary to represent and protect the interests of the person under disability, and file a report of his activities together with his recommendation upon the termination of his duties or at such other time as directed by the court." Thus, even though the prime allegiance of the guardian ad litem is to the infant, he is required, as an officer of the court, to make a thorough and fair report of the information obtained. *(Matter of Roe,* 65 Misc 2d 143, 145.)

As was discussed above, Bordoff's preliminary report to the Surrogate was, upon its face, both thorough and fair. At that point in time, the report was not directly supportive of either the proponent's or the objectant's position. Insofar as the guardian ad litem had maintained an open mind as to her ultimate recommendation to the Surrogate, it could be said that the proponent had achieved a limited and, perhaps, a temporary victory. To that extent, the proponent could expect Bordoff to continue her evenhanded approach to the investigation and, to that same extent, the proponent had the right to challenge the precipitous removal of the original guardian ad litem for one openly opposed to the probate.

Summarizing, the cross motion to vacate the order of removal should have been granted and the original guardian ad litem reinstated because of the procedural and evidentiary errors mentioned earlier in this opinion. The objectant should have been granted leave to renew the motion upon proper proof and proper service with adequate notice to the proponent and the original guardian ad litem. Due to an unforeseen change in circumstances, it may be appropriate for the Surrogate either to remove the original guardian ad litem or to permit her to resign. In such circumstances, the Surrogate has wide discretion in appointing a successor. Upon this appeal, we do not rule out the possible appointment of Camhy as a successor guardian ad litem. Although Camhy has already filed objections on behalf of the infant, that fact does not disqualify him from appointment if the Surrogate finds a sound reason in the context of this case for appointing him.

Accordingly, the order of the Surrogate's Court, New York County (MIDONICK, J.), entered July 23, 1980, insofar as appealed from, which denied the proponent's cross motion to vacate the order appointing the successor guardian ad litem, should be reversed, on the law, by granting the cross motion to vacate the order appointing the successor guardian ad litem with leave given to renew the motion to remove upon proper proof and proper service with adequate notice to the proponent and the original guardian ad litem, without costs.

KUPFERMAN, ROSS and CARRO, JJ., concur.

Order, Surrogate's Court, New York County, entered on July 23, 1980, reversed, on the law, by granting the cross motion to vacate the order appointing the successor guardian ad litem with leave given to renew the motion to remove upon proper proof and proper service with adequate notice to the proponent and the original guardian ad litem, without costs and without disbursements.